# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

GERALDINE SWIMMER, f/k/a Geraldine Mossman, individually, and as next friend of SEAN SWIMMER, f/k/a Sean Mossman, a minor;

   Plaintiffs,

v.

THE UNITED STATES OF AMERICA, and PORTERCARE ADVENTIST HEALTH SYSTEM, INC.,

   Defendants.

---

## COMPLAINT FOR DAMAGES

---

Plaintiffs Geraldine Swimmer, individually, and as next friend of Sean Swimmer, a minor, by and through their attorneys, Bogue & Paoli LLC, submit their Complaint for Damages and allege the following:

## THE PARTIES

1.     At the commencement of this action, Plaintiffs Geraldine Swimmer and Sean Swimmer were residents of the State of Colorado.  Plaintiff Geraldine Swimmer is the natural mother of Sean Swimmer.  Sean Swimmer was born on February 8, 2005 in Denver, Colorado.

2.     Upon information and belief, during the time period set forth in this Complaint, Cathy O'Neil, M.D. was a physician licensed to practice medicine in the State of Colorado and held herself out as competent to provide prenatal and delivery care to Plaintiffs.

3.     Upon information and belief, Cathy O'Neil, M.D. is an employee and/or agent and/or covered contractor of Metro Community Provider Network (hereinafter referred to as "MCPN").  MCPN is a Federally Qualified Health Center pursuant to section 330(e) of the Public Health Service Act and all claims for negligence against this facility and it's employees, agents, representatives and covered contractors are subject to the provisions of the Federal Tort Claims Act.  At all times, the employees, agents, representatives and covered contractors, including Cathy O'Neil, were acting within the course and scope of their employment, agency and contracts.

4.      Defendant United States of America is the employer of Cathy O'Neil and the principal of MCPN.

5.      Defendant Portercare Adventist Health System, Inc. (hereinafter referred to as "Porter Hospital") is a Colorado corporation with its corporate headquarters located in Denver, Colorado.  Upon information and belief, Defendant Porter Hospital employed the nurses and other personnel who provided care and treatment to Plaintiffs during the time period set forth in this Complaint.  At all times, these nurses and other personnel were acting within the course and scope of their employment and agency.

## JURISDICTION AND VENUE

6.      Plaintiffs incorporate the previous paragraphs by this reference.

7.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1346 (b)(1) (Federal Courts have Exclusive Jurisdiction over FTCA claims) and 28 U.S.C. §1367 (Federal Courts can exercise supplemental jurisdiction over state claims) and 28 U.S.C. 2675(a).

8.      Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b) since a substantial part of the events and omissions giving rise to these claims occurred within this judicial district.

9.      All of the conduct which gives rise to this action occurred in the State of Colorado.

10.      Upon information and belief, Defendant United States of America, through the MCPN, operates clinics providing healthcare in the State of Colorado. Between July 2004 and February 2005,Plaintiffs received care and treatment from employees, agents, representatives and/or covered contractors of MCPN.

11.      Upon information and belief, at the commencement of this action, Defendant Portercare Adventist Health System, Inc. had its principal place of business in  Denver, State of Colorado

## NOTICE OF CLAIM

12.      On February 2, 2007 a Standard Form 95 was sent via overnight mail to the Department of Health and Human Services, Office of the General Counsel, General Law

Division, Claims Office, 330 Independence Ave., SW, Room 4256, Wilbur J. Cohen Federal Building, Washington DC 20201.  Standard Form 95 was received by the Department of Health and Human Services on February 5, 2007.

13.     The above agency has failed to make final disposition of this claim within six months after the claim was filed and the claim is deemed denied in accordance with 28 U.S.C. 2675(a).

## CERTIFICATION

Pursuant to §13-20-602(3)(a), C.R.S. 2004, Plaintiffs certify as follows:

14.     Counsel has consulted with health care professionals with expertise in the area of the alleged negligent conduct as set forth in Plaintiffs' Complaint.   These experts include a board-certified OB/GYN who has provided labor and delivery care and is substantially familiar with the standards of care for providing labor and delivery care to patients such as Plaintiffs.

15.     The experts who have been consulted have reviewed all known facts relevant to the allegations of negligent conduct set forth in Plaintiffs' Complaint, including medical records from Porter Hospital and Metro Community Provider Network.

16.     Based upon these facts, these experts have concluded the filing of the claims against the above-named Defendants do not lack substantial justification within the meaning of §13-17-102(4), C.R.S.; and

17.     To the extent required, the obstetrician who has reviewed all known facts relevant to the allegations of negligent conduct as contained in Plaintiffs' Complaint meets the requirements set forth in §13-64-401, C.R.S. 2004.

## GENERAL ALLEGATIONS

18.     Plaintiffs incorporate the preceding paragraphs by this reference.  Unless stated otherwise, the allegations set forth in this section of the Complaint are made upon information and belief.

19.     On July 19, 2004 Plaintiff Geraldine Swimmer was seen at the MCPN clinic.  She was deemed a high risk obstetrical patient because she was an insulin-dependent diabetic and because of her age.

20.     Beginning on July 29, 2004 Plaintiff Geraldine Swimmer was seen for regular prenatal care by Joel Schwartz, M.D. at Defendant Porter Hospital.  Records of these visits were kept in the Plaintiff's medical chart at Porter Hospital.

21.     On January 31,  2005, Mrs. Swimmer was seen by Cathy O'Neil, M.D. at the MCPN Englewood, Colorado clinic.  Dr. O'Neil performed ultrasound, non-stress testing ("NST") and amniotic fluid assessment.  These assessments demonstrated normal fetal growth, an active fetus and adequate amniotic fluid.  In her note, she wrote, "Will check NST at end of week and will induce at 39 weeks."

22.     On February 7, 2005, Mrs. Swimmer was seen by Dr. O'Neil at the MCPN Englewood clinic.  On February 7, 2005, Dr. O'Neil admitted Mrs. Swimmer to Defendant Porter Hospital for induction of labor.  Dr. O'Neil examined Mrs. Swimmer, noting that her cervix was long, fingertip and high.  She estimated the fetal weight at about eight pounds.  Dr. O'Neil assessed the fetal heart tones as being "non-reactive, but reassuring, with the question of an early (sic) late decel...."  Dr. O'Neil ordered Pitocin, a medication used to stimulate uterine contractions.  In her note, Dr. O'Neil stated that Pitocin was started to "see how the child would tolerate it."

23.     An external electronic fetal heart rate monitor was applied at 2000.  An oxygen mask was placed on the mother at 2040, due to decreased variability and late decelerations.  The nurse charted a late deceleration at 2100 with decreased long term variability.  Dr. O'Neil conducted a sterile vaginal exam at 2100 and ordered that Pitocin be started at the rate of two milliunits per minute (mU/min).  Dr. O'Neil assessed Mrs. Swimmer's cervix as being fingertip dilated, thick and that the fetus was at a high station, represented by an arrow going upwards.

24.     From 2200-2300 the nurse documented the presence of late decelerations with no accelerations.  At 2245, the nurse documented that there was decreased variability.  The labor nurse increased the Pitocin to 4 mU/min at 2230, to 6 at 2300, to 8 at 2315, to 10 at 0015, to 12 at 0030 and to 14 at 0045.

25.     On February 8, 2005 at 0150 the Pitocin was increased to 20 mU/min and Dr. O'Neil attempted to artificially rupture the patient's membranes.  No fluid was noted.  Dr. O'Neil then placed an intrauterine pressure catheter ("IUPC").

26.     At 0314 oxygen by mask was again placed on the mother, presumably to provide in utero resuscitation to the fetus.

27.     At 0330 a fetal scalp electrode was placed.

28.     At 0430 Dr. O'Neil performed a sterile vaginal examination, noting that the cervix

4

was dilated from 5-6 centimeters, with 100% effacement, and the fetus was at -1 station. Amnioinfusion, another procedure to provide in utero resuscitation, was started.

29.     At 0445 fetal pulse oximetry was applied.

30.     At 0456 the nurse noted a severe variable deceleration, turned off the Pitocin, repositioned the mother, increased the fluids, increased the oxygen to the mother and notified Dr. O'Neil.

31.     From at least 0010 until delivery, the frequency of the contractions was every one to two minutes.  Except for the period from 0130 - 0215, the nurse charted decreased variability from the time of admission through delivery.  Except for one note at 0145, there were no accelerations charted at any time from admission to delivery.

32.     At 0505 a nurse suggested to the doctor that a cesarean section be performed.

33.     The anesthesiology notes indicate that the anesthesiologist was called in preparation for a cesarean delivery at 0603 but that the delivery was postponed per Dr. O'Neil's order at 0615. The informed consent form was signed on or before 0615.  The notes further reflect that Dr. O'Neil reversed her order at 0620 and then again postponed the cesarean delivery at 0625.

34.     The chart notes indicate the presence of variable decelerations from as early as 0230 and continuing until the terminal bradycardia began at approximately 0732.  Dr. O'Neil was apparently at the bedside observing the strip at 0736 at which time the Pitocin was turned off. The patient was instructed to continue to push until 0740 when Dr. O'Neil made the decision for a cesarean delivery.

35.     Sean was delivered via emergency cesarean section at 0755 on February 8, 2005. He was not breathing at the time of delivery and required cardiopulmonary resuscitation.  His Apgar scores were 0-0-0-2.

36.     Sean was transported to The Children's Hospital in Denver on assisted ventilation and arrived within four hours of delivery.

37.     Sean was diagnosed with severe hypoxic ischemic encephalopathy.  He currently suffers from cerebral palsy, developmental delays and seizure disorder.

5

## FIRST CLAIM FOR RELIEF

38.     Plaintiffs incorporate the preceding paragraphs by this reference.

39.     The Defendant United States of America, acting through its employee and agent, Cathy O'Neil, was negligent as follows.

40.     With respect to her care and treatment of Plaintiffs, Cathy O'Neil owed a duty to exercise that degree of care, skill, caution, diligence and foresight exercised by and expected of physicians in similar situations.  Dr. O'Neil deviated from that standard and was negligent, including, but not limited to:

    a.      failing to timely schedule and reasonably perform a Cesarean delivery;

    b.      failing to properly interpret the fetal monitoring strips;

    c.      failing to properly manage the Pitocin, including ordering a timely cessation of Pitocin;

    d.      failing to properly diagnose Sean Swimmer's condition while *in utero*;

    e.      failing to reasonably manage the labor and delivery;

    f.      failing to timely and reasonably consult with a specialist in the field of maternal-fetal medicine and obstetrics;

    g.      failing to timely offer a cesarean section; and

    h.      failing to provide reasonable and timely informed consent.

41.     As a direct and proximate result of the negligent conduct of Cathy O'Neil, Plaintiff Geraldine Swimmer has suffered and will continue to suffer injuries, damages and losses.   These damages include expenses on behalf of Sean for doctors, nurses, hospitals, medicines, therapists,  rehabilitation, home care and special equipment and will in the future incur similar expenses.

42.     As a direct and proximate result of the acts and omissions of Cathy O'Neil, Plaintiff Sean Swimmer has suffered injuries, damages and losses including brain damage, cerebral palsy and other damages.  Sean Swimmer's damages are permanent and include physical damage, mental damage, and related injuries and damages.  His injuries have been and will continue to be painful, disabling, incapacitating.  He has and will in the future suffer emotional

distress.  He will be forced to spend monies in the future on doctors, medicines, tests, hospitalizations, rehabilitation, various therapies, diagnostic tests, surgeries and related costs and expenses.  In the future, he will suffer a  loss of time and earning capacity as well as home services.  He has suffered a loss of his ability to enjoy a full and useful life.

## SECOND CLAIM FOR RELIEF

43.     Plaintiffs incorporate the preceding paragraphs by this reference.

44.     The Defendant United States of America, acting through MCPN and its employees an agents was negligent as follows:

45.     While Mrs. Swimmer was a patient of Cathy O'Neil, MD, and MCPN, Defendant United States of America, acting through its agents and employees, all of whom were acting within the course and scope of their employment or within their authority as agents, was negligent in its care and treatment of Plaintiffs including, but not limited to:

a.      failing to ensure proper nursing supervision and care for Plaintiffs during the prenatal care, labor and delivery;

b.       failing to develop and/or follow applicable protocols and policies for high risk obstetrical patients;

c.       failing to hire and supervise qualified nurses, physicians and other employees;

d.       failing to properly assess and diagnose the maternal/fetal status;

e.      failing to timely and properly communicate with physicians and other medical personnel regarding Plaintiff's condition and status;

f.       failing to timely schedule and perform a cesarean delivery;

g.      failing to reasonably manage Mrs. Swimmer's pregnancy.

46.     As a direct and proximate result of the negligent conduct of Defendant United States of America, Plaintiffs suffered injuries and damages as more fully set forth above.

## THIRD CLAIM FOR RELIEF

47.     Plaintiffs incorporate the preceding paragraphs by this reference.

48.     While Mrs. Swimmer was a patient at Defendant Porter Hospital, Defendant Porter, acting through its agents and employees, all of whom were acting within the course and scope of their employment or within their authority as agents, was negligent in its care and treatment of Plaintiffs including, but not limited to:

a.      failing to ensure proper nursing supervision and care for Plaintiffs during the labor and delivery;

b.      failing to properly interpret diagnostic studies provided to Plaintiffs, including but not limited to the interpretation of the electronic fetal heart rate strips and other monitoring devices;

c.      failing to develop and/or follow applicable protocols and policies for high risk obstetrical patients;

d.      failing to hire and supervise qualified nurses and other employees;

e.      failing to properly assess the maternal/fetal status;

f.      failing to properly manage the Pitocin including failing to discontinue the Pitocin in a timely manner;

g.      failing to timely and properly communicate with physicians and other medical personnel regarding Plaintiffs' condition and status

h.      failing to exercise the chain of command for nurses in similar situations;

i.      failing to reasonably manage the labor and delivery;

j.      failing to ensure and require that a properly qualified physician managed Mrs. Swimmer's care, including cesarean section;

k.      failing to have a reasonable qualifying peer review process in place responding to a physician's request for credentialing;

l.      failing to reasonably utilize peer review in response to a physician's request for credentialing;

8

m.     failing to act in accordance with the Colorado Professional Review Act (CPRA) 12-36-51, et seq. C. R.S. and Health Care Quality Improvement Act (HCQIA) in response to a physician's request for credentialing.

49.     As a direct and proximate result of Defendant Porter Hospital's negligent conduct, Plaintiffs suffered injuries and damages as more fully set forth above.

WHEREFORE, Plaintiffs pray for judgment against all Defendants and each of them, for general and special damages, together with costs, interest allowable by law, and for such other relief deemed appropriate by the court.

Dated: September 6, 2007                           Respectfully submitted,

                                                  **BOGUE & PAOLI LLC**



                                                  By: /s/ Jeffrey A. Bogue
                                                        Jeffrey A. Bogue
                                                        1401 17th Street, Ste. 320
                                                        Denver, CO 80202
                                                        Telephone: 303-382-1990

                                                        Attorneys for Plaintiffs

Plaintiffs' Address
1205 Yukon St., #112
Lakewood, CO 80214